IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CANDELARIO GARZA, | | |
| | Petitioner, | No. CIV S-08-3095 FCD GGH P |
| vs. | | |
| JAMES A. YATES, | | |
| | Respondent. | FINDINGS & RECOMMENDATIONS |
| _____/ | | |

I. <u>Introduction</u>

Petitioner, proceeding pro se, has filed a petition pursuant to 28 U.S.C. §2254. Petitioner challenges his May 30, 2006, Yolo County jury trial conviction for one count of infliction of corporal injury on a spouse, one count of dissuading a witness and one count of threatening to commit a crime resulting in death or great bodily injury.  It was also found that petitioner had previously been convicted of infliction of corporal injury on a spouse, had suffered a prior serious or violent felony and had suffered three prior prison terms.  Petitioner was sentenced to a term of 18 years, 4 months.  Answer to Petition (Answer), filed on May 6, 2009. Petitioner raises the following grounds for relief: 1) erroneous admission of prior bad acts to show propensity to commit the crime and 2) upper term sentence violated the Sixth and

\\\\\

1

Fourteenth Amendments under Cunningham.[1]  Original Petition (Petition) at 5.

After carefully considering the record, the court recommends that the petition be denied.

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 495, 117 S. Ct. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue.  Williams (Terry), 529 U.S. at 407-08, 120 S.Ct. at 1520-1521 (2000).  It is this prong of the

---

[1] Cunningham v. California, 549 U.S. 270, 127 S.Ct. 856 (2007).

2

AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S.Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S.Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

\\\\\

\\\\\

III. <u>Background</u>

The opinion of the California Court of Appeal, Third Appellate District, contains a factual summary. After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

> K.G. married defendant in Reno in June 2004. In October 2005, they lived in a trailer parked in the yard of defendant's employer, Zamora Trucking, in Woodland. Defendant worked on October 9, 2005, a Sunday, and returned home around 7:00 or 7:30 p.m. At around 10:00 p.m. he got upset with K.G., eventually accusing her of infidelity. K.G. denied the accusation, making defendant more irate.
>
> As was her custom, K.G. decided to let matters cool down and walked out of the trailer. Defendant yelled at her from the trailer and then went outside. Swearing at her, defendant told K.G. to get in the house or "people are going to hear you and people are going to call the cops."
>
> Defendant then grabbed K.G. by the hair and dragged her to the trailer, repeatedly punching her in the head with his closed fists while telling her to keep quiet. He threw her inside the trailer, causing K.G. to hit her knees. K.G. was on the floor of the trailer in the fetal position, horrified, hysterical, and scared. Defendant closed the trailer door, yelling, "Go ahead, yell, go ahead yell, call the cops, call the cops" while holding his fist about three inches from her mouth.
>
> Defendant picked up a hammer and raised it as if to strike K.G.'s head. He then put the hammer down and said, "Go ahead, call the cops, call the cops, I'll kill you if you call the cops." K.G. had heard this threat before and it usually kept her from calling the police.
>
> Defendant told K.G, "You are not going anywhere" and threw her purse to the opposite end of the trailer. The wounded K.G. asked for ice, which made defendant angrier. K.G. replied, "It feels like I am not in Kansas anymore," and defendant became angrier still, telling her to shut up and saying, "What? Do you want some more of this?"
>
> Later, after having a beer, defendant calmed down and tearfully told K.G. he was sorry. Defendant told her to go out and get some hamburgers. Instead, K.G. drove to a Denny's parking lot, where she stayed for 30 to 45 minutes before driving to the apartment of her friend, K. Gray.
>
> At Gray's apartment, K.G. looked into a mirror and saw a large lump on her forehead and her lips were "busted and bleeding." She also had bald spots from where defendant had pulled out her hair. K.G. called the police and recounted defendant's attack to the responding officer.
>
> According to the officer, K.G. had: "two circular, approximately half-inch scrapes on both sides of her chin. She also had an approximate half-inch bruise in the center of her upper lip and approximately one-inch circular bruise that was

swelling in the center of her forehead."

K.G. told the officer she had been involved in approximately 50 physical altercations with her husband during their marriage. Although she said the injuries on her chin were from an incident two months ago, they appeared fresh to the officer. K.G. accepted the officer's offer to get her an emergency protective order.

K.G. testified to prior acts of abuse from defendant. They first lived in Vallejo after marrying. Defendant started to abuse her in October of 2004, when he backhanded her in the face and called her a "F'in bitch." Even though K.G. tried to please him, defendant constantly made derogatory remarks to her during their first few months together.

Defendant hit K.G. a few more times while they were living in Vallejo with one of defendant's friends. One attack took place in the bedroom, where defendant hit her over the head with his fist, pushing her into the entertainment center and knocking over speakers. He struck her five or six times with closed fists but left no visible injuries. She did not report the incident because she still had hope and wanted to try harder. Defendant also once put a putty knife to her arm and accused K.G. of having an affair.

Another incident occurred when they were living in their own residence in Vallejo. Defendant and K.G. were arguing over K.G.'s son eating at the breakfast table. After she turned her back and started to walk away, defendant threw a wax candle, striking K.G. in the back of the head. K.G. crouched in the corner in a fetal position, covering her head with a cushion from the couch. With blood gushing from her head, K.G. told defendant she was bleeding, which only made him madder. Defendant then pushed and shoved K.G. to the shower to wash the blood from her clothes.

The cut to her head was deep and about two inches long. K.G. asked to go to the hospital, but defendant accused her of being a snitch who wanted to get him in trouble. Her son had been in the bedroom, but came out after defendant threw the candle.

K.G. told her mother about the incident and went to a battered women's shelter. She left the shelter after three days and returned with her son to live with defendant. This led to K.G.'s eight-year-old son being placed in foster care. K.G. did not want to file a police report or request a restraining order, as she was afraid to make waves with law enforcement. Defendant had often told K.G. that, "If you are a snitch you die," which made her afraid for her life.

Although defendant promised not to hit her, the physical abuse resumed within a week of K.G.'s return. K.G. once again left defendant to spend some time at a friend's house, but thereafter returned to live with defendant. The pace of the beatings increased, and by the summer of 2005 defendant was hitting K.G. weekly. Although K.G. frequently left defendant, she would eventually return to him.

K.G.'s son testified. He once saw defendant push his mother into a cupboard

5

when they were living in Vallejo, causing her mouth to bleed. Another time he was in his bedroom and peeked out, seeing defendant throw the candle at K.G.'s head, cracking it open. The candle was five inches long and about an inch and a half round. Another time, defendant pushed K.G. into a television.

In February 2005, K.G.'s mother picked up K.G. and her son in Vallejo. K.G. was visibly nervous and shaken as she entered the car. She showed her mother a fresh cut on the top of her head, about three-to-four inches long and one-third to one-quarter of an inch wide.

K.G. said defendant was angry with her for not getting tortillas from the store and threw a large pillar candle at her head. K.G.'s mother told her to get the wound looked at, but K.G. was afraid this would get her hurt more. K.G.'s mother told Children's Protective Services about the incident as she was afraid for her daughter and grandson.

K. Gray testified that K.G. started coming to her apartment in Woodland in February or March 2005. She noticed a great change in her friend's behavior, as K.G. would now "curl up in a ball and cry, and she was just somebody else." Starting in March, K.G. and defendant stayed with her for three to five months. Defendant fought with K.G. every day during their stay, yelling at her, throwing things, and calling her names.

K.G. came to Gray's apartment on the night of the October 9th incident. She was scared, had a big lump on her head, and her lip and nose were bloody, fat, and cut. K.G. also showed Gray a bald spot, explaining this happened when defendant dragged her into the trailer by her hair. She also had a huge lump on the top of her head and a lump on the side of her head, towards the back.

T.L. had a romantic relationship with defendant in 2000 and 2001. She broke off the relationship and one week later, in September 2001, defendant called, saying he wanted to come to town and talk with her. T.L. said no, hung up, and went out to celebrate her birthday with a friend.

She returned to her home at 3:30 a.m. and found the front door unlocked and slightly opened. Her son had earlier told T.L. defendant was there. After T.L. went to the bedroom and turned on the light, defendant grabbed T.L. by the hair and began hitting her on the nose and eyes with his fists. T.L. unsuccessfully struggled to get away, and the beatings only stopped when she agreed to lie down in bed with him.

Defendant had sex with T.L. She did not want to have sex with defendant, but went along because she was scared. Defendant, who was drunk, eventually passed out allowing T.L. to escape.

T.L. suffered a broken nose and black eyes from the assault. When she first turned on the light, she noticed defendant's nickname was written on the wall. While hitting her, defendant said, "I should have shot you like I shot my former wife, Olga." Defendant tried to return to T.L.'s house the next week, but was stopped by her nephew. He was convicted of domestic violence charges and sent to prison as a result of the assault on T.L.

> An expert testified on domestic violence. Domestic violence can be emotional or physical, and is inflicted so the perpetrator can assert power over the victim. There is often a cycle of violence, where the abuse is followed by a honeymoon period as the abuser fears the victim will leave, which is then followed by more abuse as the abuser reasserts his power.
>
> Abusers often tell their victims they will kill them or do something to their children if they leave. The cycle of abuse is often a bonding experience, leading to a tight bond between the abuser and victim. As a result, it is common for the victim to be unable to leave the relationship. The expert did not interview the victim or read any of the police reports.
>
> The defense called the social worker from Children's Protective Services assigned to K.G. and her son. K.G. told the social worker that she had missed a scheduled visit with her son on October 7 because defendant had held her hostage by driving her around. K.G. previously said she had no contact with defendant.
>
> Defendant's employer testified that defendant was driving trucks for him on the days of October 8 through October 10, 2005. During that time, defendant worked almost every day of the week.

Lodged Document No. 5 at 2-8. See also People v. Garza, 2008 WL 188055 at 1-4.

## IV. Argument & Analysis

### Claim 1 - Admission of prior bad act testimony

Petitioner contends that the trial court erred in allowing the jury to hear testimony of a former girlfriend who stated petitioner assaulted and raped her. Petition at 8.

*Legal Standard*

"State court rulings on the admissibility of evidence generally fall outside the scope of federal habeas relief, which is designed only to remedy violations of federal law." Winzer v. Hall, 494 F.3d 1192, 1198 (9th Cir.2007). The United States Supreme Court has clearly established that "a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process." Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir.1999) (citing, inter alia, Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468 (1962)). In addition, "[a] successful petition for collateral relief rooted in a claim of trial error must demonstrate actual prejudice, that is, a 'substantial and injurious effect or influence in determining the jury's verdict.'" Renderos v.

Ryan, 469 F.3d 788, 798 (9th Cir.2006) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993)).

*Discussion*

At trial, petitioner's ex-girlfriend, T.L., testified about an incident in 2001, a week after she ended her relationship with petitioner, where petitioner broke into her home, assaulted and raped her. Petitioner contends that the admission of this testimony was more prejudicial than probative and it was likely petitioner was convicted in the instant case based on this prior bad act. Petitioner argues that the admission of this propensity evidence was a violation of federal due process. The Court of Appeal, Third District denied this claim on appeal with a reasoned decision.

> Generally, evidence of a person's character or past conduct to prove conduct on a specified occasion is inadmissible. (Evid.Code, § 1101, subd. (a).)[2] Section 1109 provides an exception for prior acts of domestic violence in a domestic violence case. (§ 1109.) This section permits a jury to consider prior incidents of domestic violence for the purpose of showing a defendant's propensity to commit offenses of the same type. (Ibid.) However, the evidence is still subject to section 352.
>
> Section 352 permits a court to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusion, or misleading the jury. (People v. Harris (1998) 60 Cal.App.4th 727, 730.) Section 352 weighing is a safeguard that ensures admission of propensity evidence does not violate due process. (People v. Harris, supra, at p. 730.)
>
> The trial court's decision under section 352 is reviewed for abuse of discretion. (People v. Escobar (2000) 82 Cal.App.4th 1085, 1097.) It will not be overturned unless "palpably arbitrary, capricious and patently absurd." (People v. Jennings (2000) 81 Cal.App.4th 1301, 1314.)
>
> Defendant asserts the assault described in T.L.'s testimony involved an unauthorized entry and lying in wait, two factors not found in the other charged and uncharged offenses. These factors do not render the assault described in T.L.'s testimony inadmissible under section 352. The assault on T.L. tended to show defendant's propensity to commit acts of violence against domestic partners with whom he was dissatisfied. Although the charged offenses did not involve this level of planning or lying in wait, they were at least as violent as the assault described in T.L.'s testimony. The testimony of defendant's initial assault on T.L. was relevant propensity testimony and not so prejudicial as to warrant exclusion

---

[2] Hereafter, undesignated statutory references are to the Evidence Code.

1  under section 352.

2  Defendant also argues the testimony should have been excluded because it included defendant's rape or sexual assault on T.L.  He is mistaken.

3  For a definition of "domestic violence," section 1109, subdivision (d)(3), refers to the meaning set forth in Penal Code section 13700: "(a) 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.  [¶] (b) 'Domestic violence' means abuse committed against an adult or a minor who is a ... person with whom the suspect has had a child or is having or has had a dating or engagement relationship."  This includes the crime of rape.  (People v. Poplar (1999) 70 Cal.App.4th 1129, 1139 (Poplar ).)  Indeed, "rape is a higher level of domestic violence, a similar act of control."  ( Ibid.)

There was overwhelming, detailed evidence of defendant committing several vicious assaults on K.G., his wife.  Defendant's sexual assault evidence against T.L. was not prejudicial in light of the remaining prior misconduct evidence including the evidence that defendant assaulted K.G. in the presence of K.G.'s child, or K.G.'s testimony regarding the instant offenses.  "The evidence was extremely probative, showing defendant's propensity for violence against domestic partners.  The prior incidents of domestic violence were not the sort to evoke an emotional bias against defendant. [Citation.]"  (Poplar, supra, 70 Cal.App.4th at p. 1139.)  Accordingly, we conclude the trial court correctly admitted the sexual assault testimony.

People v. Garza, 2008 WL 188055 at 4-5.

Petitioner has failed to demonstrate a violation of federal due process or that the state court opinion is contrary to established Supreme Court precedent.  There is no clearly established Supreme Court authority regarding the admission of propensity evidence, in fact the Supreme Court specifically chose not to rule on the issue in Estelle v. McGuire, 502 U.S. 62, 75 112 S.Ct. 475 (1991).  The Ninth Circuit addressed this issue in Alberni v. McDaniel, 458 F.3d 860 (9th Cir.2006):

"...The circumstances of this case are more like those present in Earp [v. Ornoski, 431 F.3d 1158 (9th Cir.2005)], in which we declined to declare a constitutional principle clearly established after the Supreme Court had expressly concluded the issue was an "open question."  Earp, 431 F.3d at 1185.  We held in Earp that "the advent of AEDPA forecloses the option of reversing a state court determination because it conflicts with circuit law."  Id.  We cannot conclude that the Nevada Supreme Court acted in an objectively unreasonable manner in concluding that the propensity evidence introduced against Mr. Alberni did not violate due process, given that Estelle [v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385

9

(1991) ], expressly left this issue an "open question." [¶] The right Mr. Alberni asserts has not been clearly established by the Supreme Court, as required by AEDPA..."

Alberni, 458 F.3d at 866-67.

While the Supreme Court has not ruled on the admission of propensity evidence, the Ninth Circuit has held that admitting other crimes evidence does not violate due process. See U.S. v. LeMay, 260 F.3d 1018, 1027 (9th Cir.2001), cert. denied, 534 U.S. 1166, 122 S.Ct. 1181 (2002). In LeMay, the court found Federal Rule of Evidence § 414, which governs the admissibility of prior conduct in cases of child molestation, to be constitutional on its face. Id. The court stated that the admission of propensity evidence "will only sometimes violate the constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have." Id. The court determined that due process concerns were alleviated because under Federal Rule of Evidence § 403, propensity evidence is excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Id. at 1026, 1028.

The holding of LeMay applies in the instant case. First, just as prior acts of child molestation were relevant as propensity evidence in LeMay, evidence of petitioner's other acts of domestic violence is relevant to show that petitioner likely committed the charged offense. Second, the operation of California Evidence Code § 1109 in conjunction with California Evidence Code § 352 mirrors that of Federal Rule of Evidence §§ 414 and 403, in that the state trial court is required to exclude propensity evidence when its probative value is substantially outweighed by its prejudicial effects. Thus, the requirement under California Evidence Code § 352 to balance the prejudicial effect of the evidence against its probative value ensures that domestic violence evidence admitted under § 1109 will not infringe on the right to a fundamentally fair trial guaranteed under the Due Process Clause. See LeMay, 260 F.3d at 1026-27.

\\\\\

The state court ruling upholding the admission of the prior bad act testimony, was not contrary to established Supreme Court precedent and petitioner has failed to show that the testimony had a substantial and injurious effect or influence in determining the jury's verdict. This claim is denied.

### Claim 2 - Upper term sentence

Petitioner contends that the trial court erred in imposing an upper term sentence in violation of Cunningham. Petition at 8-9.

*Legal Standard*

In Cunningham v. California, 549 U.S. 270, 127 S.Ct. 856, 871 (2007), the Supreme Court found that the middle term in California's sentencing scheme was the statutory maximum for purposes of analysis under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), and that state trial courts were barred from imposing a sentence beyond the middle term based on any fact that was not determined by a jury and proven beyond a reasonable doubt. There is a narrow exception to this rule, however, for enhancements that are based on prior convictions; these need not be submitted to the jury. See Almendarez-Torres v. United States, 523 U.S. 224, 244, 118 S.Ct. 1219 (1998); Butler v. Curry, 528 F.3d 624 (9th Cir.2008) ("[T]o hold that the Constitution requires that recidivism be deemed an 'element' of petitioner's offense would mark an abrupt departure from a longstanding tradition of treating recidivism as 'go[ing] to punishment only.'").

The instant claim was denied without a reasoned opinion by any state court. If a state court denies constitutional claims without a reasoned decision, a federal court reviewing a habeas corpus application pursuant to § 2254(a) "ha[s] no basis other than the record for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context." Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000). "While Supreme Court precedent is the only authority that is controlling under AEDPA, we look to Ninth Circuit case law as 'persuasive authority for purposes of determining whether a

particular state court decision is an "unreasonable application" of Supreme Court law.' " Luna v. Cambra, 306 F.3d 954, 960 (9th Cir.2002). Thus, pursuant to Delgado, the Court must conduct an independent review of the record to determine whether the state court's decision was objectively unreasonable. In Delgado, the Ninth Circuit held that, "Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." 223 F.3d at 982; see also Luna, 306 F.3d at 954 (quoting Fisher v. Roe, 263 F.3d 906, 915 (9th Cir. 2001) (internal citation omitted) ("We reverse only if 'a careful review of the record and the applicable case law leaves us with the "firm conviction" that the state court was wrong.' ")).

*Discussion*

In count one, petitioner was found guilty of infliction of corporal injury on a spouse, Cal Penal § 273.5(a). The court found true that petitioner had previously been convicted of infliction of corporal injury on a spouse, suffered a prior serious or violent felony and had suffered three prior prison terms. Clerk's Transcript (CT) at 205-208, 213, 247. Petitioner was sentenced on this count to five years in prison, the upper term.[3] CT at 247-48. The trial court doubled the sentence pursuant to Cal. Penal § 667(c) and (e)(1).[4] Id. Petitioner contends that trial court erred by using the upper term, relying on facts not found by the jury. At sentencing, the trial court stated:

"...I think in a case like this because of the sentencing law often times the Court

---

[3] Petitioner was sentenced in the middle-term of the other counts and he does not challenge those sentences.

[4] Cal. Penal § 667(e)(1) states: (e) For purposes of subdivisions (b) to (i), inclusive, and in addition to any other enhancement or punishment provisions which may apply, the following shall apply where a defendant has a prior felony conviction:

(1) If a defendant has one prior felony conviction that has been pled and proved, the determinate term or minimum term for an indeterminate term shall be twice the term otherwise provided as punishment for the current felony conviction.

12

> does not have a whole lot of discretion. Were I to have discretion and have the opportunity to exercise it, [petitioner] has given me no reason to.
>
> I've entertained the arguments and I feel both attorneys have done a very good job in handling this case I don't see any signs of racism or conspiracy or anything else, and that's just from what [petitioner] said in court today.
>
> When I look at his statement to probation he says the whole trial was [a] fabrication and now he denies any guilt. This gives me absolutely nothing to offer hope that [petitioner] learned anything in that year long anger management class that he took or that he's been rehabilitated at all.
>
> In fact, it's just the opposite, that he learned nothing and he continues to be an extreme danger because of his unwillingness to take responsibility for his conduct. So just in looking at his statement and attitude toward the case were I in a position to exercise discretion he has not given me any reason to do that, and so I look at the guidelines which I'm bound by.
>
> In Count 1, which is 273.5(e)(1), the upper term is five years, the lower term is two, the mid term is four. In determining the appropriate sentence I look at the Court Rules 4.421 and 4.423.
>
> I don't see anything in mitigation. The fact that he survived parole, completed a program gives no indication that he learned anything. If it has any mitigating contribution it would be minimal. Especially weighed with his numerous prior convictions and numerous parole violations, so it appears to me that the upper term of five years is appropriate."

RT at 830-31.

Though it is not clear from petitioner's pleadings, it appears that he may be arguing that the trial court relied on facts not found by the jury. However, the court was clear in relying on the prior felony in imposing the upper term and simply commented that if the court had discretion, it did not look favorably on petitioner's conduct.

Even if the court had relied on other factors to impose the upper term, the sentence was still appropriate as the court also relied on the prior conviction, and needs only one aggravating factor to authorize an upper term sentence. Butler v. Curry, 528 F.3d 624, 641 (9th Cir.2008); People v. Black, 41 Cal.4th 799, 815 (2007). Of course, finding a prior conviction for sentencing purposes is not an Apprendi et al. violation. Butler at 643-644. Petitioner's sentence was not contrary to established supreme court law and this claim is denied.

\\\\\

1  Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for
2 a writ of habeas corpus be denied.
3  These findings and recommendations are submitted to the United States District
4 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
5 days after being served with these findings and recommendations, any party may file written
6 objections with the court and serve a copy on all parties.  Such a document should be captioned
7 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
8 shall be served and filed within ten days after service of the objections.  The parties are advised
9 that failure to file objections within the specified time may waive the right to appeal the District
10 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
11 Dated: 08/26/09

/s/ Gregory G. Hollows

_____
UNITED STATES MAGISTRATE JUDGE

ggh:ab
garz3095.hc